Good morning, Your Honors. Jean Reese, USC Immigration Clinic Pro Bono Counsel for Ms. Valeria De La Luz Ramos. I'd like to start with the Board's determination that Ms. De La Luz Ramos' conviction was particularly serious because Ms. De La Luz Ramos is a transgender woman from Mexico who experienced past persecution and but for this determination she is eligible for asylum and withholding. Ms. De La Luz Ramos injected her best friend who was also a transgender woman with silicone at her friend's request. The injection of silicone is intended to produce a more feminine appearance in certain body parts and is common in the transgender community. Her friend suffered an uncommon side effect and died and Ms. De La Luz Ramos was convicted of involuntary manslaughter. The Board's entire determination rests on a misunderstanding of the nature of Ms. De La Luz Ramos' involuntary manslaughter conviction. This is then compounded by the failure to conduct an individualized analysis based on the court conviction doctrines and the testimony of Ms. De La Luz Ramos and expert Dr. Olson Kennedy who is an expert in transgender health. The BIA finds that Ms. De La Luz Ramos committed an act involving a high risk of death or bodily harm without consideration of such risks and there is no such finding. What is the California, I understand that the statute doesn't say anything about those factors but my understanding is that the case law does require criminal negligence for a conviction even when you have a non-inherently dangerous felony as the trigger. Is that correct? That is correct, Your Honor, and criminal negligence is an objective standard so it would be sufficient that a person should have been aware of the risks even if they didn't know and in this case Ms. De La Luz Ramos' unlawful act was practicing medicine without a license and so a doctor would have known of those risks. There is no finding required for the conviction that she was aware and disregarded them only that she should have been aware and a doctor in this case would have been aware. Furthermore, the risk to life does not involve a high risk. As Dr. Olson Kennedy testified, there is a risk of an embolism which could lead to death which is what happened in this case but those side effects are in the minority. This shows that the BIA makes this finding that she was aware of the risks and disregarded them and the jury instructions as well for this statute do not require such a finding. The complaint that the prosecutor filed is under the theory of involuntary manslaughter by unlawful act. The factual basis for the plea is that she engaged in unauthorized practice of medicine and that it was the proximate cause of the death. Wait a minute, so what the BIA recognized, the BIA maybe unlike the IJA said that they understood that it might be a non-inherently dangerous felony but the fact remains that the respondent committed a criminally negligent act that resulted in the death of a human being and it then goes on to quote what it says is the criminally negligent standard. It requires that a lawful act which is committed in an unlawful manner involve a high risk of death or bodily harm and be done without due caution or circumspections. Is that accurate? Well, that's in applying the commission of a lawful act and so that case law that the board cites to doesn't apply to Ms. De La Luz Ramos. The basis of the criminal negligence is the unlawful act, the operating with, you know, doing a medical procedure without a license. And so... ...involving a high risk of death or bodily harm without consideration of such risk. I think a lawful act requires that additional done in this dangerous way to have a high risk of death or bodily harm. I don't think that that is inherent in an involuntary manslaughter conviction and it was not the theory of criminal negligence under which Ms. De La Luz Ramos was convicted. So the objective standard... It's a higher risk than an unlawful act. So if it's an unlawful act, it seems that it should be a lesser risk. Well, an unlawful act, I guess that it's more of a per se, you know, criminal negligence there because the act... The problem is I don't know how we get behind... As long as they're not inaccurate in terms of what the California law is, I'm not persuaded that they are. Then how do we get behind their conclusion? The particular serious crime thing is ridiculously vague and maybe you have a Johnson claim but you haven't made one. But leaving that aside, I don't understand how we conclude that their determination that this is a particular serious crime is an abuse of discretion if they have the right understanding of what the crime is. Right. Well, so presuming they do have an understanding of the right crime, which I don't think they do, the entire particularly serious crime determination rests on this one-size-fits-all, on-its-face involuntary manslaughter conviction. And in this case, Francesco requires an individualized analysis. That's the problem with this. Francesco sounds like it does, but after that it was revised to be a question of what the crime is and not what the individual... the crime generically is and not about the individual. Well, the underlying conviction are individualized circumstances and that has to be considered. For example, regarding an abuse of discretion on government sites to ARBID, there the particular serious crime is found solely on the underlying acts, not just the generic mail fraud, but the scheme that the respondent participated in, that ARBID participated in, the defrauding of almost $2 million, the testimony of ARBID that showed that he didn't accept responsibility. Likewise, in Avendano, we're talking about the specific injuries in those cases, which the Board rested on. Here, we're just talking about this application of case law that is not applicable to Mr. Lalez-Ramos' theory of involuntary manslaughter and nothing regarding the individualized analysis, such that this finding of a high risk of death is inconsistent with the record, but also that she was aware of consequences and disregarded them. I think this also goes to this prevailing cisgender perspective, which is why the testimony of Dr. Olsen-Kennedy as a transgender health expert is really important, because it shows all the circumstances and the other risks that a transgender woman of color are considering when Ms. De La Luz-Ramos decided to agree to inject her friend with silicone, that there's this high risk of death, and this body modification could even be lifesaving because gender dysmorphia produces high rates of suicide when you have body parts that don't conform to your gender identity, but that also the closer you align with your gender identity, especially as a transgender woman of color, the safer you are, because you're less likely to be identified as transgender, where 99% of transphobic homicides in the U.S. are against transgender women of color. So there was a lot more than just this kind of high risk to death, to life, and a disregard of those risks. There were other risks that are particular to the conduct underlying this conviction, which, while the unauthorized practice of medicine was the unlawful act, a doctor would have known of the risks, there were other risks. And here, I think even under an abuse of discretion, the board acts contrary to the law because they don't conduct an individualized analysis, and they don't rely on the proper factors. I think in addition here, we also have the testimony of Ms. De La Luz-Ramos that she didn't know somebody could die, that she did it because she felt indebted to her friend who had helped her with food, with housing. And Dr. Olsen-Kennedy, again, testified that the side effects of silicone injections and embolism are in the minority. May I ask a question? Are you going to talk about the attack issue? Yes, thank you, Your Honor. I think also with the Convention Against Torture, here the board finds that while Ms. De La Luz-Ramos suffered past torture by private actors, it was not with the acquiescence of the government. So let's take just the last incident of torture at the hands of the La Familia gang members where she was kidnapped, she was raped with the barrel of a gun, and then went to the police station to report. She was referred to as one of the fags from Guadiana. She was told she needed to know the names and to have the license plate of the car. The police refused to investigate. So here Ornelas Chavez v. Gonzalez only requires that a public official could have inferred that torture was taking place and remained willfully blind. Here the police had direct knowledge. The police called her a fag and did not investigate. I think the government's argument that because she didn't have the information they wanted and because she left is without merit, especially when you take it in the entirety of the record where there was escalating incidences of violence against her that she reported to the police and she was met with insults. Why are you leaving out this thing about the phone call? I'm not leaving it. Thank you. The phone call, she was threatened while she was in the station and the only person who had her phone number were the police or the Ministerio Publico where she went. So she was found to be credible. The facts that she testified to are accepted as true. So we also have not only evidence of a refusal to investigate but evidence of corroboration with the police or corruption and all of those lead to a clear showing of acquiescence which compels a reversal of the court's determination. We were reviewing this de novo. I think I would agree with you that police's awful comments suggest they may not investigate. But as you know, our standard review here is very limited and the evidence has to compel a contrary conclusion. So even if we disagree with the IJ and the BIA, isn't there some evidence that the police did try to do something? Maybe they weren't the most effective police, but the fact that they were asking, do you have a license plate number or something along those lines, doesn't that suggest that we did something? Again, taking into account our limited standard review. Your Honor, I think that the question is, did they stand by? And that's exactly what they did. It's not, did they ask a few questions or make some pretextual effort? The question is, did they stand by? And they stood by while the gang members were robbing her customers, while her business was being vandalized, while there was a Molotov cocktail, and they stood by while this kidnapping occurred. So I think that we have met the requirement that it compels a contrary conclusion. The police actually... The BIA, I don't know about the IJ, the BIA did not mention this telephone call at all, as I recall, which was evidence of some collusion. Maybe the BIA said it was, somebody said it was speculative, but I don't know what was so speculative. And they also said that she was insulted and called derogatory names, and that's not torture, but that wasn't her point. Her point was that they called her names and said, and so we don't care about you and we're not going to do anything. Yes. We don't deal with that at all. That's correct, Your Honor. And so it's inconsistent, and it's such a departure from the record to say that Ms. De La Luz-Ramos provided no evidence that the police stood by or were unwilling to help her, when they literally, in the testimony, in the transcript, they say, we don't care about you, we're not going to waste our time with you. And I think that also the escalating violence to where she just leaves because she's being threatened, and in the past she's never been protected, and that's what prompts her to leave Mexico, because things are escalating and no one is going to protect her. And I don't see how the BIA can find that she has not produced any evidence that a public official would acquiesce, where public officials acquiesced on several occasions to the harm against her, especially in this last incident. I have a question. What do we know what happened to her if she returned to Mexico now? What do we base that on? Well, the board says that there's no evidence that anyone's looking for her in Mexico, but that's not the standard. The board cites Avendano v. Hernandez, where a transgender woman experienced past persecution by a public official and was found to be eligible for CAT. There was no evidence on that record that people were still looking for her in Mexico. So I think it's a bit of a red herring for the board to say, and anyway there's no evidence people are still looking for her. It seems to me that the board opinion is really based primarily on the fact that there was not a sufficient probability that she would be tortured again, unless on the acquiescence. What about the second point, or that point, i.e., what is the evidence? I mean, the problem is it has to be probable that she would, right? That's correct, Jana, and the board really doesn't explain why it feels it's a possibility but not a probability, especially when the regs say that evidence of past torture is highly relevant and significant to the probability of future torture. And here also we have country conditions evidence that shows that homicides against transgender women are one of the highest in the country of Mexico, that laws aren't effective in protecting transgender women, that the public officials themselves extort and are violent against transgender women. So it's not just these isolated incidences that constitute the past torture, but the country conditions as well indicate that there is this probability of future torture, and probability is more likely than not. And on this record, the BIA doesn't explain why it thinks it's just a possibility and not a probability. And I think that given the importance and the extent of the past torture, not to mention the other torture she experienced from other actors regarding being attacked by a dog, being raped by strangers and family members, I think that that here establishes that probability, and the board doesn't really explain why it doesn't other than to say that it's just a possibility, and I don't think that the evidence here compels a contrary conclusion. So I see I have one minute left that I'd like to reserve for rebuttal. Thank you. Ms. Braga. May I please the court? Victoria Braga, appearing on behalf of the Attorney General. The court should deny the petition for review because the agency did not abuse its discretion in finding Ms. Dela Luz-Ramos' crime particularly serious, and therefore sufficient to bar her from asylum and withholding relief. The agency also relied on substantial record evidence in its denial of cat protection. Addressing first the particularly serious crime determination, the court reviews this determination under the deferential abuse of discretion standard and may only overturn the findings if the agency acted arbitrarily, irrationally, or contrary to law, particularly in the particular... What makes a particularly serious crime particularly serious? So a particularly serious crime is based on the danger of the crime. It's not necessary for the agency to make a separate finding on dangerousness, but a particularly serious crime raises a presumption of danger, and that's something that the court says in Avendano-Hermanos. What does a presumption of danger mean? Can a presumption be rebutted? So the agency and this court has been clear that the factors looked at when determining whether a crime is particularly serious are just looking at the nature of the crime, the underlying facts, and the sentence imposed. It's not necessary then to separately inquire whether the person continues to be a danger. The analysis is about the conduct committed and the seriousness of the conduct committed. There's no room in the analysis to analyze then whether the person... It's basically done on a generic crime basis, not a question of a presumption. Right. So when someone has been convicted of a particularly serious crime, it is a finding that that crime is dangerous and therefore sufficient to bar the person from asylum and withholding of removal. What's the presumption language mean in Avendano? So Avendano said the applicable legal standard to determine if a crime is particularly serious requires the agency to ask whether the nature of the conviction, the underlying facts and circumstances, and the sentence imposed justify the presumption that the convicted alien is a danger to the community. So that's the quote from Avendano. I think that the court may have discussed it in those terms because previously under old board case law, there was a thought that after those factors were analyzed, there then should be a separate inquiry into whether the person remained dangerous. But in a matter of NAM, which is a 2007 case, the board was clear that it was not necessary to then further inquire into the person's dangerousness. Simply the three factors needed to be analyzed to determine whether the crime was particularly serious. And then once that determination was made, the inquiry was over. And if the crime was found to be particularly serious, the person was barred from asylum and withholding of removal. So the court's inquiry when reviewing a particularly serious crime determination is limited to ensuring whether the agency relied on the appropriate factors, and those are the three factors that I just referenced, and whether the agency properly considered the evidence. In Avendano-Hernandez, the court said that the court may not reweigh the evidence and make its own determination about the crime's seriousness. So the government's position, the petitioner here, is essentially asking the court to reweigh the evidence and to take more account of what the agency described as certain mitigating factors. The board used a standard, which may not be the right standard, I don't know if it is or not, which required there be a high risk of death or of harm and a low of death. And I thought the evidence was there wasn't a high risk of death, there was a risk of death. So how does the record support that conclusion? Or is it the wrong standard? I don't know that the board said that this crime involved a high risk of death. The board did focus on the nature of the crime as described under California case law and quoted certain sections of that case law in indicating that the crime would involve... So this is a quote from California case law. From an inherently dangerous felony, which apparently it did. The case law requires that the lawful act, although it has to be an unlawful act, I understand that, which is committed in an unlawful manner, I guess that's involved a high risk of death or bodily harm and be done without due caution or circumspection. So the respondent committed an act involving a high risk of death or bodily harm without consideration of such risks. So the question is, does the record support the fact that there was a high risk of death as opposed to a low risk of death, but a risk? I think the record does support that there was a high risk of death because that language is taken from California case law. I think it's Keeple v. Murray and then also the Seahorse Ranch case. So those are the terms of her conviction. She would not be able to be convicted under the statute unless her offense involved those factors, including a high risk of death or bodily harm and that the offense be done without due caution or circumscription and that her offense be contrary to a proper regard for human life. So I know that Petitioner was a high risk of death, even though the record in this case indicates that there was a low risk of death, essentially. Well, I think that is Petitioner's argument, that because an expert testified that there was not a high risk of death for her particular conduct, then that should in some way undermine or change the nature of her offense as defined by California case law. But we think that that, first of all, is inappropriate for the court or the agency to go behind the terms of a conviction. The court and the agency have always been clear that the nature of the offense is the first factor focused on in a particularly serious crime analysis. So here the agency appropriately focused on that, considering California case law, and then it went on to analyze the underlying circumstances of the conviction, recognizing that there were some mitigating factors, but that those factors were not sufficient to mitigate against the high risk involved in the conduct. And additionally, the agency said the tragic circumstances or the tragic result of the conduct in this event. The agency also appropriately focused on the sentence imposed, which was not the maximum sentence for the crime, but which was also not the minimum. So here I think it's clear that the agency did take account of each of the francescu or matter of NAM factors, and the court's review being limited to that question, whether the agency appropriately took account of the factors and the evidence of record, the court should find that the agency did not abuse its discretion in finding that Ms. Bill Lewis-Ramos' crime qualified as a particularly serious crime. Moving next to the denial of cap protection. This is also reviewed by the court under a deferential substantial evidence standard of review. The court can only overturn the agency's conclusion or disagree with the agency's conclusion if the record compels a contrary conclusion. To qualify for cap protection, an individual must prove that it is more likely than not that they would be tortured upon return to their home country, and the torture must be by or with the acquiescence of a public official. Here the agency focused on various aspects of the torture or the harm that Ms. Bill Lewis-Ramos feared. It analyzed the harm she had experienced in the past, and it noted that this harm was by private actors. The agency did take account of the fact that the police, when Ms. Bill Lewis-Ramos reported offenses to them, were not as responsive as they could be, and that they did act inappropriately toward her. However, this falls short of qualifying an acquiescence to torture. The record also shows that... I don't see where the agency took that into account. It says that with regard to the child abuse, while regrettable and repugnant, these instances were perpetrated by... and the respondent has not demonstrated that a public official consented or was aware of the activity and breached his or her legal responsibility, and that's it. To the extent the respondent was insulted and called derogatory names, that's not torture. But again, her testimony was that they called her derogatory names and said, therefore, you don't matter and we're not going to investigate, number one. And number two, they don't deal with this telephone call at all, which she says indicates collusion and not simply unawareness. And they also don't deal with... There was other testimony in the record that said that when she said on several occasions that she... if she went to the police, that would simply... if she... that the police... going to the police wouldn't do anything and it would lead to more activity by the gangs because she would be making a big fuss about it. So none of that is in this opinion at all. It looks like they just didn't take any of it into account. And then they go to the country conditions and they simply seem to discount a pretty strong bit of records, including this Cornell report that indicates that the police are simply not willing to deal with transgender crimes. So why is there an adequate showing? How does this opinion demonstrate that the record was taken into account? I think the opinion certainly doesn't take into account each of the pieces of record evidence  But there is testimony from Ms. Jones from the record that she went to the police after she was assaulted and they asked her for additional information about the crime. So although police officers may have made comments to her indicating or insulting her and indicating that they were... that they might be unwilling to help her, they also took some steps to follow up and to get more details from her. Similarly, when she had gone to the police on other occasions, I think she said even on one occasion they came out to her business as part of an investigation. She claimed that they asked her for bribe money. That certainly is inappropriate conduct, but general corruption among the police department or among police officers individually does not prove that the police would be unable or unwilling to protect Ms. DeLuz-Ramos if she were to suffer incidences of harm or torture in the future. Additionally, with regard to country conditions reports, there are certainly... or there is certainly evidence in the country conditions reports that transgender individuals like Ms. DeLuz-Ramos can face the possibility of harm and of having crimes against them mischaracterized in Mexico. The agency, the board's decision, takes account of that, I think, in the last paragraph of its decision. But it should also be noted that the most recent country conditions report in the record, the 2016 report, does indicate that there have been some improvements and that there have been some measures taken to improve those sorts of abuses. So, I think looking at the totality of the record evidence and reviewing it under the substantial evidence standard, the agency... the record does not compel, concluding contrary to the agency, that Ms. DeLuz-Ramos did not establish a probability that she would be tortured or, in other words, that it... How do we determine when police inaction amounts to acquiescence? I mean, for example, if the police said derogatory things, like in this case, and then took down notes and then didn't ask any questions at all, would that amount to acquiescence? Well, I think it goes a little bit back to the standard of review. So, the court is reviewing deferentially the agency's determination that it did not amount to acquiescence. But, additionally, the court does have case law saying that acquiescence requires that the investigating agency be aware of the torture or the harm, and then they breach their legal duty to prevent such harm. So, here, the board does focus on the fact that, despite the harm that Ms. DeLuz-Ramos may have suffered in the past, she has not established that anyone in Mexico would be looking for her currently or would be seeking to harm her currently. And she did not establish, given how the police had responded, maybe not perfectly, but had made some effort to respond to her request for help in the past, that if she were to be targeted in the future, they would breach their legal duty to not assist and to not intervene to prevent her future harm. So, I think my time has expired. I'm looking again to see whether the IJ ever mentioned this telephone call. It doesn't look like he ever mentioned it either. Yeah, the IJ does mention the telephone call. It's on page 83 of the record. I'm not sure if he does it in the analysis of his decision, but when he discusses her testimony, he does say on the bottom of page 82, she was in the station waiting for them to open an investigation when she received a call through the phone number that she had given to the police. The only other person that knew she had had that number was an employee. The call was from a gang member who threatened that they would kill her. She was scared, so she left the station. She believed the police were working with the gangs. It is true, though, that the board does not reference that call. He doesn't mention it at all in his analysis. I believe that... He doesn't mention it when he gets to the discussion of why there was no acquiescence. Right, I believe that was the extent of the IJ's discussion, and the board does not discuss... To my knowledge, the board does not discuss the call in his decision. I would say that it was based on Ms. Ellis-Ramos' testimony, just that she did not know of anyone else who had the number, so it is speculative, and speculative links in a chain. Well, it's so constituent. That's the difference from speculative. If this was evidence in a murder trial, it would probably be given in some fair amount of weight as circumstantial evidence. It may not be dispositive, but it's certainly worth taking into account, and it wasn't taken into account. I don't know what speculative means. It's circumstantial. It's not direct evidence, but it's certainly the sort of evidence that is used even in a criminal trial to demonstrate connections or collusions. I mean, this person spoke to that person, or there was a phone call that's unexplained or whatever, and it just disappears from the scene. Well, I think it's speculative in the sense that Ms. Ellis-Ramos herself is speculating that the police may have given him the telephone number to the gang. She's not speculating. She's surmising from the facts, the facts being that no one else had the telephone. She's being credible. Nobody else had this phone number except the employee and the police. That's what she knows. So how do these people know that she's at the police station and have the phone number? So even credible testimony can be required to be corroborated, and here there's just this testimony that it is her belief that the police may have given her number to the gang. The IJ does reference it, but doesn't obviously think that that factors into finding that in the totality of the circumstances, she did not prove that she was more likely than not to be tortured with the acquiescence of public officials, and the board affirms the IJ's finding on that point. Well, I'll be right back. So thank you very much. Thank you. Thank you. Thank you. Thank you. Just to get to this issue of the telephone call and her being credible, opposing counsel said that even if you're credible, you require corroborating evidence, and that's not true. However, the country conditions report supports the inference from this circumstantial evidence that there was corruption. The Cornell report at tab C says that police often work with cartels and gangs, with 98% of all crimes going unpunished. And so this is beyond just speculation, and the judge and the BIA don't address why this is not evidence of acquiescence. To talk about the... Sorry, going back to the phone, I may have missed the record. Whose phone was it that she was using? An employee. The gang members took her phone after they kidnapped her, so she borrowed her employee's phone. And so the only person who had the phone number was the employee and the police because they asked her for her phone number, and she gave them that phone number that she had. And then the gangs called her on that phone number while she was in the station and threatened to kill her, and she left. Regarding this question of whether a high risk of death is required for involuntary manslaughter, it's not required. The case law that the board cites cites to this conduct where a hole is in the fence and there's this high likelihood of death to motorists from the horses getting out. That is not... There is nowhere in the record or in the statute or the jury instruction that a high risk of death is required. And I think the only convictions that on their face are asylum and withholding are aggravated felonies. This is not an aggravated felony. Even voluntary manslaughter is not an aggravated felony. And that's why the board is required to look... What is the criminal negligence standard of which she was convicted, and what is the case you rely on for that? So the criminal negligence standard has been called without due caution and circumspection. And so there is nothing about a high risk of death there. And we didn't cite this case in our brief, but the seminal case on inherently dangerous felony theory is People v. Burroughs. And there it's just criminal negligence, which is just a departure from the standard of care. It's an... But there has to be some risk of death, no? Well, it is the proximate cause of a death, so it has to be dangerous. And so there's no... There's some... It has to be dangerous. Not inherently dangerous. But it's not... Exactly, not inherently dangerous. So it has to be this additional departure from what a reasonable person would give due caution and circumspection to. But it does not require a high risk of death. And so... One last question. I'm trying to find the testimony about when the police came to her place of business. It's portrayed by the government as if they were coming to investigate. Is that what the record shows? No. The record shows that she reported it through telephone calls and that she was told that they needed to pay her. I can look in the record where... Oh, here we go. They asked for money for gas. They're not going to waste time with them. I just can't remember. I thought that when they came... I'm not sure they actually came. They said they were going to come, but they needed to get paid or something like that. Is that what happened? That's correct. And I would just close that the standard is that they are unwilling to protect, that they are standing by, not that they can ask a few questions and not be effective at protecting. So it's not... Under this acquiescence, it's clear that asking a few questions, asking for money, is not sufficient to the duty to protect someone from torture. And so here are the evidence and the country conditions evidence established, and the BIA and the IJ are silent as to why they think it's just a possibility and why there's no acquiescence. And so in light of that, it compels a reversal. Okay, we're going to time this up. Thank you very much. Thank you. The case of Jules Ramos v. Suarez submitted, and we will take, let's say, an eight-minute break. This court stands on recess for ten minutes.
judges: Siler, Berzon, Lee